UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>QUINDELL NUNN,<br><br>    Defendant. | Case No. 14-cr-00636-TEH<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |

This matter is before the Court on Defendant's motion to suppress evidence. (Docket No. 26). The Government filed a timely response, to which Defendant replied. (Docket Nos. 34, 48). The Court heard oral argument on June 1, 2015. After carefully considering the Parties' written and oral arguments, the Court finds an evidentiary hearing unnecessary and DENIES Defendant's motion for the reasons set forth below.

**BACKGROUND**

On the afternoon of March 20, 2014, three Menlo Park Police Department ("MPPD") officers were stopped at a red light in an unmarked police vehicle at the intersection of Bay Road and University Avenue in East Palo Alto, California. Ex. A to Phillips Decl. at 004, 010 (Docket No. 17-1). From this location, the officers could see the parking lot of the U.S. Post Office at 1600 Bay Road directly to their left. In their reports and declarations, the officers stated that they regularly patrolled this area, and knew it to be a location where narcotics sales are common. *Id.* at 010; *see also* Cowans Decl. ¶ 2 (Docket No. 36); Torres Decl. ¶ 2 (Docket No. 35).

While waiting at the light, the officers observed a red Honda sedan pull into the post office's parking lot, stopping briefly at the sidewalk to let a passenger exit. Ex. A to Phillips Decl. at 004, 010. The passenger, later identified as Marvin Millbrook, walked to the southwest corner of Bay and University, where he "began to waive his right arm as if

1    he was attempting to flag somebody down." *Id.* at 010.  Sergeant Cowans reported that he

2    "could also clearly see that [Millbrook] had paper money in his right hand," and that

3    "Millbrook's behavior and mannerisms were consistent with individuals that [he had]

4    previously seen in the area who were attempting to quickly purchase narcotics in the

5    street."  *Id.*  Meanwhile, the driver of the Honda remained in his vehicle, where he

6    "appeared to be looking around all directions, over both of his shoulders."  *Id.*

7           "Approximately 10 seconds later," a red minivan driven by Defendant Quindell

8    Nunn pulled into the post office parking lot and parked in a "cockeyed position next to the

9    Honda."  *Id.*  Defendant claims that he saw the officers' unmarked car waiting at the red

10   light before he turned into the parking lot.  Nunn Decl. ¶ 2 (Docket No. 30).  Millbrook

11   approached Defendant's vehicle and opened the passenger side door.[1]  *Id.* ¶ 3; Ex. A to

12   Phillips Decl. at 004, 010.  Detective Torres reported that the brief conversation involved

13   Millbrook "lean[ing] into the inside of the van with his upper body."[2]  *Id.* at 004.  None of

14   the three suspects went into the post office.  *Id.* at 004, 010.

15          When the light turned green, the officers made a U-turn, pulled into the post office

16   parking lot, and parked directly behind Defendant's minivan.  *Id.* at 004; Nunn Decl. ¶ 4.

17   Defendant immediately exited his vehicle and closed the door behind him when he saw the

18   officers.  Ex. A to Phillips Decl. at 004, 010.  The three officers exited the vehicle and

19   approached the suspects.  *Id.*  Detective Torres was wearing a black Menlo Park Police

20   tactical vest with "Police" written on the front and back, as well as a full duty belt.  *Id.* at

21   004.  Detective Venzon was also wearing a tactical vest with "Police" written on it.  *Id.* at

22   008.  Sergeant Cowans was wearing a dark shirt that said "Police" and had an image of a

23   police badge.  Nunn Decl. ¶ 5.  All three officers' guns were visible from their duty belts,

24   but were not drawn.  *Id.*; Ex. B to Phillips Decl. ("Body Camera Video") (Docket No. 27-

---

[1] Defendant states that this interaction occurred *before* he had completely parked. Nunn Decl. ¶ 3. This difference is immaterial.
[2] Detective Venzon provided the same account, while Sergeant Cowans reported that Millbrook "reached inside the minivan and out of [his] view." *Id.* at 008, 010. This minor inconsistency is immaterial, as both observations are consistent with behavior that might indicate a drug transaction, and are substantially similar accounts of the suspect's actions.

United States District Court
Northern District of California

2). Sergeant Cowans asked Defendant for identification. *Id.* at 010. Defendant handed Cowans his driver's license, which Cowans gave to Detective Torres before walking away to speak with the other driver. *Id.*

When asked what he was doing in the parking lot, Defendant told Torres that he was meeting with Millbrook about yard work. Ex. C to Phillips Decl. at D0001 ("Body Camera Tr.") (Docket No. 27-3). Torres told Defendant: "The reason we stopped you is by the way that you were parked right here, you know, talking to the dude . . . . We get a lot of complaints that people stop here and, you know, do stuff they're not supposed to do and stuff." *Id.* Torres then asked Defendant if he had anything illegal on him; Defendant said he did not. *Id.* Torres asked Defendant if he would consent to a search; Defendant declined. *Id.* After running Defendant's information through dispatch and finding out that he had no warrants and was not on parole, Torres returned Defendant's license to him and said, "Here you go, Mr. Nunn. You going to get back in your car?" *Id.* In his declaration, Torres stated that it was his understanding that Defendant was free to go at that point. Torres Decl. ¶ 5. Defendant said, "I can't move till you move," to which the officer responded, "Yeah, we'll be out of your way in a minute, man." Body Camera Tr. at D0003-0004. Defendant immediately said, "I want to make sure he come and do what he supposed to do, though." *Id.* at D0004. Torres asked, "Oh, he owe you money?" *Id.* Defendant responded, "He's supposed to be doing the fucking yard." *Id.* Torres replied, "All right." *Id.*

At this point, approximately two minutes had passed since Torres began speaking with Defendant. *See* Body Camera Video. Millbrook consented to a search of his person, and the officers found him carrying a plastic bottle with a copper mesh piece commonly used as a screen for cocaine base pipes. Ex. A to Phillips Decl. at 008. Defendant remained by his car, walking around unrestrained. Torres Decl. ¶ 5; Cowans Decl. ¶ 5; Body Camera Video. Cowans asked Defendant a few additional questions. Body Camera Tr. at D0004-0007. Defendant again declined to be searched. *Id.* After this brief exchange, Cowans walked over to Defendant's van and looked through the windows,

3

1    where he saw "approximately 3 inches of the butt of a handgun" under the driver's seat.
2    Ex. A to Phillips Decl. at 010-011; Body Camera Video at 4:00; Exs. 1 and 2 to Cowans
3    Decl. (Docket Nos. 36-1, 36-2).
4      Because Defendant is a previously convicted felon, he was arrested by the officers.
5    Approximately four minutes passed between when Detective Torres started speaking with
6    Defendant and when the gun was found. Ex. 3 to Cowans Decl. (Docket No. 36-3)
7    (dispatch report showing incident initiated at 13:48 and defendant taken into custody after
8    the discovery of the gun at 13:53). Upon further search of the minivan, the officers found
9    a bag containing 21 rocks of cocaine base. Ex. A to Phillips Decl. at 005. After additional
10   questioning, Millbrook admitted that he was there in order to help the driver of the sedan
11   buy cocaine base and that he intended to discuss a drug purchase with Defendant when
12   they were interrupted by the officers. Ex. A to Phillips Decl. at 005-006; Body Camera
13   Video; Body Camera Tr. at D0020-0021.

**LEGAL STANDARD**

  The Fourth Amendment establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. In determining whether a person is seized for Fourth Amendment purposes, courts consider whether, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quotation marks omitted). A motor vehicle is seized under the Fourth Amendment when "there is a government termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (emphasis omitted); *see also Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (property is seized when "there is some meaningful interference with an individual's possessory interests in that property").

4

1   Warrantless seizures are presumed to be unreasonable.  "The government bears the
2   burden to show that a warrantless seizure does not violate the Fourth Amendment."
3   *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988).  A failure to
4   meet this burden requires that all evidence illegally seized and derived from the search or
5   seizure be excluded.  *United States v. Scott*, 705 F.3d 410, 416-17 (9th Cir. 2012); *Elkins v.*
6   *United States*, 364 U.S. 206, 223-24 (1960).

## DISCUSSION

### I. Defendant was not seized when the officers parked behind him.

Defendant contends that he was seized when the officers parked their patrol car behind his van, blocking it in against the curb.  Mot. at 9-11.  The Government disagrees, appropriately relying on *United States v. Kim*, 25 F.3d 1426 (9th Cir. 1994), which found that the act of blocking in a parked vehicle does not result in a seizure of its occupants. Opp'n at 7-8.

In *Kim*, officers parked behind an already parked car, partially blocking it in.  *Id.* at 1430.  The Ninth Circuit held that the defendant was not detained by the officers' use of the patrol vehicle to block the defendant's car, emphasizing the fact that the car was "already parked."  *Id.*  The appellate court reasoned that the officers did not stop the defendant or force his car to be anywhere other than where it already was.  *Id.* Importantly, the court noted that its conclusion would not have changed even if the car had been more completely blocked, as the defendant could have still departed, "even if on foot."  *Id.* at 1431 n. 2.

Here, as in *Kim*, an "avenue of departure" remained open to Defendant, as he also could have departed on foot after his car was blocked by the police.  *See id.*  In fact, by the time the officers parked behind Defendant's vehicle, he had already exited the car, demonstrating an even greater freedom of movement at the point of contact than the defendant had in *Kim*.  *Compare* Torres Decl. ¶ 4 ("Nunn got out of the minivan, and both he and Millbrook closed the car doors, when our unmarked police car pulled into the

5

parking lot."), *and* Nunn Decl. ¶ 4 ("After I parked my minivan, I opened the door and got out of the vehicle. As I got to the rear of the minivan, I saw the same police car . . . come up and park directly behind my minivan."), *with Kim*, 25 F.3d at 1428 (agent began questioning the defendant while he was still seated in the car).

      Defendant's attempts to distinguish *Kim* are unavailing. Reply at 5-7. First, Defendant argues that he was the driver, not a passenger like Kim, and the hemming in of his vehicle was therefore more coercive. However, *Kim* ascribed no significance to the defendant's status as a passenger, and Defendant cites no case law where this has been a meaningful distinction. Instead, the issue in *Kim* was whether the defendant's car was already parked and whether an avenue for departure remained open. *See Kim*, 25 F.3d at 1431 n. 2. Defendant's second argument, that the car in *Kim* was only partially blocked, fails because the appellate court made clear that its holding would have been unchanged even had the car been "more completely blocked." *Id.* Third, Defendant contends that the officers' actions conveyed that they were targeting him, unlike in *Kim*. It is unclear why Defendant believes that *Kim* did not involve targeting, as the patrol car in that case parked behind the defendant's car after he had entered it, for the express purpose of keeping the vehicle from leaving. *Kim*, 25 F.3d at 1428. Fourth, Defendant argues that his car had been parked for a shorter time than Kim's. However, *Kim* offered no indication that the amount of time the car was parked was significant; the operative question was whether the car was intercepted while moving. Finally, Defendant argues that the investigating officer in *Kim* was dressed in plainclothes and not visibly armed, unlike the officers in this case. However, the clothing worn by the officers as observed *after* they exited their parked vehicle has no bearing on whether parking behind Defendant's car constituted seizure.

      In support of his position, Defendant cites only one case from this circuit, *United States v. Kerr*, in which the Ninth Circuit found a defendant seized when an officer "intercept[ed]" him while he was "backing his car out" of the driveway. 817 F.2d 1384, 1385-87 (9th Cir. 1987). Because Defendant's car was parked when it was blocked by the officers, *Kerr* is inapposite. Defendant's other authority is comprised of out-of-circuit

6

decisions, many involving cars that were not parked. *See, e.g.*, Mot. at 10 (citing *United States v. Jones*, 678 F.3d 293 (4th Cir. 2012), which explicitly distinguished itself from cases where officers "come upon an already parked car"). Even where Defendant cites to out-of-circuit decisions involving parked cars, this Court must follow *Kim*'s clear guidance.

Applying the binding precedent of *Kim*, the Court finds that Defendant was not seized when the officers hemmed in his parked vehicle. In making this determination, however, this Court is compelled to express its concern with the dubious reasoning in *Kim*. It is pure fiction, even if indeed a legal one, that an individual could feel free to leave and ignore the presence of police officers after a patrol car parks directly behind their vehicle. However, the Court is satisfied that Defendant was not seized by the officers' actions, as Defendant had already exited the vehicle before the officers parked behind it - making the act much less coercive - and Defendant was nonetheless detained only moments later.

## II. Defendant's vehicle was seized when it was hemmed in by the police.

While Defendant was not seized when the officers parked behind his vehicle, his van was. The seizure of a vehicle occurs "when there is a government termination of freedom of movement through means intentionally applied." *Brower*, 489 U.S. at 597 (emphasis omitted); *see also Soldal*, 506 U.S. at 61 (property is seized when "there is some meaningful interference with an individual's possessory interests in that property"). When the officers parked behind Defendant's vehicle, it became blocked between the curb in front of the vehicle and the patrol car behind it. The vehicle's freedom of movement had been intentionally terminated, constituting a seizure of the vehicle. However, the seizure of the vehicle was constitutional for the same reason the seizure of Defendant was constitutional, which is explained in more detail below.

### III. Defendant was seized when the officers stopped and questioned him.

The Ninth Circuit has identified five factors that aid in determining whether a seizure has occurred upon police contact: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officers' tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter. *Orhorhaghe v. INS*, 38 F.3d 488, 494-96 (9th Cir. 1994).

After applying these factors, the Court finds that Defendant was subject to an investigatory detention when the officers approached him, told him he had been stopped, and requested his identification. After observing the police make a U-turn and block his minivan, Defendant witnessed three officers exit the vehicle and approach him wearing police attire and carrying clearly visible weapons on their duty belts. Nunn Decl. ¶¶ 2, 4; Ex. at to Phillips Decl. at 004, 008. Defendant was not informed that he could terminate the encounter. While the officers spoke to the suspects in a calm tone, did not draw their weapons, and requested permission to search the suspects, the Court finds that a reasonable person in these circumstances would nonetheless understand that they were "the target of [the officers'] investigation" and "not free to leave." *Kerr*, 817 F.2d at 1387. Moreover, that Defendant was detained at this point is supported by Detective Torres's assertion that Defendant had been "stopped." Body Camera Tr. at D0002 ("The reason we stopped you is by the way that you were parked here, you know, talking to the dude.").

### IV. The investigatory stop was supported by reasonable suspicion of criminal activity.

Officers are permitted to conduct investigatory stops of suspects when they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quotation marks omitted). Officers must be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion . . . . that the particular person being stopped has committed or is about to commit a crime."

8

1   *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)
2   (emphasis omitted).  While a mere "hunch" is not sufficient to establish reasonable
3   suspicion, *Terry v. Ohio*, 392 U.S. 1, 27 (1968), "considerably less than proof of
4   wrongdoing by a preponderance of the evidence" is required.  *United States v. Sokolow*,
5   490 U.S. 1, 7 (1989).

6   In analyzing the constitutionality of an investigatory detention, courts look to "the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).  Officers are permitted to draw upon their experience and knowledge about criminal behavior.  *Id.*  Reasonable suspicion may be derived from a series of acts that individually might have an innocent explanation, but when taken together "warrant[] further investigation."  *Terry*, 392 U.S. at 22.

14  Here, the Government offers a list of particularized and objective reasons that the officers believed that a drug transaction was taking place.  Opp'n at 9-10.  The Court finds many of these reasons compelling.  First, Millbrook was observed standing at the street corner waiving money and beckoning in a manner familiar to the officers as indicating a drug transaction.  Ex. A to Phillips Decl. at 004, 010.  While Defendant can conceive of an innocuous explanation for this behavior, officers are permitted to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Arvizu*, 534 U.S. at 273 (quotation marks omitted).  Sergeant Cowans has been employed with the MPPD for twenty years.  Cowans Decl. ¶ 1.  Detective Torres has been with the Department for eight years, and was with the East Palo Alto Police Department (EPAPD) for four years before that.  Torres Decl. ¶ 1.  On the day in question, the officers were patrolling the area as part of the MPPD Narcotics Enforcement Team.  Ex. A to Phillips Decl. at 008.  The Court evaluates the officers' reasonable suspicion against this background.  *See United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000)

("an officer's experience may furnish the background against which the relevant facts are to be assessed").

Second, Sergeant Cowans reported that Millbrook "appeared rushed and anxious" when waiving the money at the intersection, "nervously looking up and down the street." Ex. A to Phillips Decl. at 010. Similarly, the driver of the other car was looking around over both shoulders. *Id.* Defendant notes that these details were included in Sergeant Cowans's report, but not in the reports prepared by Detectives Torres and Venzon. Reply at 12. This minor difference in details, however, is insignificant. Sergeant Cowans's report was more detailed than Torres's report, generally - an unsurprising fact given that Sergeant Cowans had a better vantage point from the driver's seat, in addition to having more experience preparing reports as the veteran officer. Moreover, that one report contains details not found in the others is to be expected; in fact, the Court would be more suspicious if the reports were identical, suggesting coordinated fabrication.

Third, Defendant appeared to be in a rush to complete the interaction, parking hastily and in a cockeyed position next to the other car. Ex. A to Phillips Decl. at 010. Defendant disputes this "rushed" and "hasty" characterization. Reply 13-14. However, video from the officers' body cameras shows that Defendant did park in a cockeyed position next to the other car. *See* Body Camera Video. Furthermore, that the officers observed all of the (even undisputed) behavior in the time it took for the stoplight to turn green suggests that the suspects were moving quickly.

Fourth, the officers reported that while speaking with Defendant, Millbrook reached or leaned into the minivan. Specifically, Detective Torres reported that Millbrook "leaned into the inside of the van with his upper body," which the officer found consistent with a drug transaction. Ex. A to Phillips Decl. at 004. Detective Venzon reported the same behavior. *Id.* at 008. Sergeant Cowans reported that Millbrook "reached inside the minivan." *Id.* at 010. The minor difference in the description of Millbrook's "reaching" or "leaning" is insignificant, and this activity was reasonably suspicious in light of the totality of the circumstances and the officers' expertise. *See United States v. Cortez*, 449 U.S. 411,

417-18 (1981) (assessment of reasonable suspicion should include "consideration of the modes or patterns of operation of certain kinds of lawbreakers," with the evidence "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.").

Finally, the officers claim as an additional basis for their reasonable suspicion the fact that the intersection was a common area for narcotics sales.[3] Ex. A to Phillips Decl. at 010; Torres Decl. ¶ 2; Cowans Decl. ¶ 2. Where officers allege that their reasonable suspicion was in part based upon a characterization of the area where the stop took place as "high crime," courts are encouraged to carefully evaluate these claims. *Montero-Camargo*, 208 F.3d at 1138. Specifically, the Ninth Circuit cautioned:

> The citing of an area as "high crime" requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity. District courts must carefully examine the testimony of police officers in cases such as this, and make a fair and forthright evaluation of the evidence they offer, regardless of the consequences. We must be particularly careful to ensure that a "high crime" area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.

*Id.* In its analysis, the Court must "examine with care the specific data underlying" the officers' "high crime area" assertion. *Id.* at 1138 n. 32.

Defendant provided the Court with a list of all drug-related arrests made by MPPD officers in East Palo Alto in the 3.5 months leading up to Defendant's arrest on March 20, 2014. Ex. D to Phillips Reply Decl. (Docket No. 49-1). Defendant argues that, during this period, no drug-related arrests were made at the intersection of Bay and University by

---

[3] The other justifications offered by the Government are not compelling. While Sergeant Cowans recognized Defendant from a prior narcotics arrest, he did not communicate this fact to anyone until well after Defendant had been seized. Similarly, while the officers claim to have smelled marijuana on Defendant, they made no note of this at the time. Finally, the Court is unable to find support in the record for the Government's claim that the parking lot was empty, and does not find it suspicious that the suspects did not go into the post office immediately upon entering the parking lot.

11

MPPD officers, which Defendant contends is contrary to Torres and Cowans's claim that they had witnessed drug-related behavior and made narcotics-related arrests in the area. Reply at 16. Defendant also provided the same arrest data for the EPAPD. Ex. E to Phillips Reply Decl. (Docket No. 49-1). Based upon the combined arrest data, Defendant contends that the arrests are evenly distributed throughout East Palo Alto, undermining the officers' claim that the intersection was an especially "high crime area" within the city. Reply at 19. The Court disagrees with Defendant's assessment.

First, the data do not directly contradict the officers' claims. Torres and Cowans stated: "On a routine basis, including **in the months leading up to** Nunn's arrest," they (1) "personally **witnessed** numerous incidents of drug use and drug sales **near that intersection**," and (2) "carried out numerous arrests concerning narcotics **in that area**." Torres Decl. ¶ 2 (emphasis added); *see also* Cowans Decl. ¶ 2 (same). Regarding the first claim about witnessing drug use, the data provided by Defendant only include arrests and calls for service, and therefore cannot speak to what the officers *witnessed*. Moreover, as the Government noted at oral argument, MPPD officers often conduct surveillance in East Palo Alto at the request of EPAPD. During these surveillance operations, officers might witness drug transactions without making arrests because they are undercover or because drug trafficking is not part of the mission. Finally, "near that intersection" is a broader area than the four street corners considered by Defendant's argument.

Regarding the second claim about making narcotics-related arrests, the officers' claims are again uncontroverted by the data. Defendant's decision to construe the phrase "months leading up to Nunn's arrest" to mean the 3.5 months before the arrest is arbitrary. Additionally, the officers said the arrests were made "in that area," not at the four street corners of the intersection, as insisted by Defendant. That the officers are referring to a larger space than contemplated by Defendant is evident from the rest of the officers'

statements, which discuss specific locations within a four block radius.[4]  *See id.*  When the Court looks at the data in this light, there are numerous "arrests concerning narcotics" in the "area," even in the narrow 3.5 month window advocated by Defendant.  Defendant offers no reason to believe that the officers are being untruthful when they claim to have been involved in those arrests.  Moreover, even if additional data were to be presented to show that these officers made no recent narcotics-related arrests in the "area," the officers' statements can be fairly construed, in context, to communicate that the area had long experienced a high volume of drug-related criminal activity, and that this had not changed in recent months.  Either way, the Court disagrees with Defendant's argument that the data undermine the officers' reasonable suspicion.

Second, contrary to Defendant's argument, the Court finds that the data support the officers' belief that this area of East Palo Alto was a "high crime area."  In the four block radius of the intersection at Bay and University, the crime data identify more than two dozen drug-related arrests in Defendant's narrow 3.5 month window.  Exs. D and E to Phillips Reply Decl. (Docket No. 49-1).  This number is substantial when compared to other similarly sized areas in the city.[5]  *See id.*  Additionally, the arrest statistics provide only part of the picture, as they do not account for the numerous drug-related service calls in the area.  *See* Ex. E to Phillips Reply Decl.  Moreover, because the data do not include arrests made by the joint drug trafficking task force involving San Mateo County, it is likely that the actual number of arrests is even higher.  Finally, the Court disagrees with Defendant's claim that the arrests appear "evenly distributed" throughout East Palo Alto.

---

[4] *Montero-Camargo* cautions district courts not to allow "high crime" labels to be applied to entire communities and neighborhoods.  208 F.3d at 1138.  That is not the case here, as nothing suggests that this four block radius constitutes any "neighborhood" or "community" within East Palo Alto.  Furthermore, the topography of this "area" - including the streets, parking lots, and buildings - makes a four block radius a reasonable zone for consideration.

[5] Defendant's comparison of the intersection's arrest numbers to arrests made in the various districts of San Francisco is unhelpful.  The question is whether crimes occurred at this location "with unusual regularity."  *See Montero-Camargo*, 208 F.3d at 1138.  It sounds in reason that the relative regularity of the crimes should be based upon the surrounding area.  Otherwise, defendants could always make comparisons to larger cities with higher crime rates, making a "high crime area" assertion impossible to maintain.

Instead, they appear to cluster in certain areas, including at Bay Road and University Avenue. *See* Ex. 3 to Wallstrum Decl. (Docket No. 50-1) (showing additional clusters at Bell Road and University Avenue, and Donohoe Street and University Avenue).

Even if the data undermined the officers' "high crime area" assessment, which it does not, the Court would still find that there was sufficient reasonable suspicion for the stop on the basis of the suspects' observed behavior. The characteristics of an area where a stop occurs is only one "independent factor" in a court's reasonable suspicion analysis. *Montero-Camargo*, 208 F.3d at 1138. In *Terry v. Ohio*, the seminal case on investigatory stops, an officer "observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another." *Arvizu*, 534 U.S. at 274 (summarizing Terry). Despite the fact that walking in front of a store and looking through its windows are independently innocent acts, the petitioner's behavior combined to "warrant[] further investigation." *Id.* The Government has demonstrated that the same was true of the suspects' observed behavior in this case.

## V. Defendant was released when Detective Torres returned his license; his subsequent conversation with Sergeant Cowans was consensual.

### A. Defendant was released and stayed at the scene voluntarily.

After Detective Torres determined that Defendant did not have any warrants, he returned Defendant's license and said, "Here you go, Mr. Nunn. You going to get back in your car?" Body Camera Tr. at D0003. Detective Torres explained in his declaration that it "was [his] understanding that Nunn was free to go at that point." Torres Decl. ¶ 5. Although the Ninth Circuit has not addressed this specific factual scenario, other appellate courts have held that the return of a driver's papers communicates the end of an investigative detention and indicates that the individual is free to leave.

In *United States v. Meikle*, 407 F.3d 670 (4th Cir. 2005), the officer returned the defendant's papers and shook his hand after conducting a traffic stop. *Id.* at 671. The defendant was walking back to his car when the officer asked if they could speak again, and the defendant eventually consented to a search of his car. *Id.* at 671-72. The Fourth

14

1    Circuit found this second engagement "purely consensual," stating that the defendant
2    "understood that he was free to leave," in part because "[t]he officer had . . . returned all of
3    [the defendant's] papers, which . . . signaled that [the defendant] could go." *Id.* at 673-74.
4    Other cases have also found the return of paperwork to conclude an investigatory
5    detention. *See, e.g., United States v. Farrior*, 535 F.3d 210, 219 (4th Cir. 2008) (return of
6    license and registration "strongly indicates that the encounter was consensual and that no
7    seizure occurred" after that point); *United States v. Bradford*, 423 F.3d 1149, 1158 (10th
8    Cir. 2005) (return of license suggests investigatory detention had ended). Furthermore, the
9    Supreme Court has declined to require that an officer explicitly tell a defendant that he is
10   free to leave in order to end an investigatory detention and engage in a consensual
11   encounter, noting that such a requirement would be "unrealistic." *Ohio v. Robinette*, 519
12   U.S. 33, 40 (1996).

13       Here, Detective Torres returned Defendant's driver's license and asked if he wanted
14   to get back into his vehicle. At this point, Defendant was free to leave, a fact he appeared
15   to understand because he communicated that he wanted to stay and speak with Millbrook,
16   and, before his arrest, freely walked over to see what Sergeant Cowans was doing near his
17   minivan. Ex. A to Phillips Decl. at 010-011; Body Camera Video. Despite the fact that
18   Defendant's car remained blocked by the officers' patrol vehicle, Defendant could have
19   departed on foot at any time, as discussed above.

### B.    Defendant's vehicle remained constitutionally seized.

While Defendant was no longer detained, his vehicle remained seized, as its "freedom of movement" had not been restored. *See Brower*, 489 U.S. at 597. The continued seizure of Defendant's vehicle, after he had been personally released, raises the question of whether the duration of the vehicle's seizure was constitutional. The Court finds that it was. In *United States v. Sharpe*, the Supreme Court held: "In assessing whether a detention is too long in duration to be justified as an investigative stop," courts "examine whether the police diligently pursued a means of investigation that was likely to

confirm or dispel their suspicions quickly, during which time it was necessary" to continue the detention. 470 U.S. 675, 686 (1985); *see also United States v. Rodriguez*, 135 S. Ct. 1609, 1614 (2015) ("the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the [specific] violation that warranted the stop").

During the approximately four-minute period between when the officers parked behind Defendant's vehicle and when they discovered the gun, the three officers diligently pursued their investigation. The officers asked the suspects whether they were involved in a drug transaction, investigated why they were meeting in the parking lot, and explored whether they had any arrest warrants. As part of this investigation, it was more than appropriate for the officers to look through the windows of the vehicle in which they suspected a drug transaction had occurred or was about to occur at the time of the stop. The seizure of the vehicle for approximately four minutes while the officers questioned the suspects was clearly of a tolerable duration that lasted "no longer than [was] necessary to effectuate" the purpose of the stop. *Rodriguez*, 135 S. Ct. at 1614.

### C. Defendant's conversation with Sergeant Cowans was consensual.

A consensual encounter does "not trigger Fourth Amendment scrutiny." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). After an investigatory detention ends, further questioning is consensual as long as those questions are made "without further constraining the driver by an overbearing show of authority." *Bradford*, 423 F.3d at 1158. An officer does not have to inform the suspect that he "does not have to respond to questioning" or that he is free to leave. *Id.*

In *Bradford*, the Tenth Circuit found that the defendant was consensually engaged with the officer despite the fact that both of them were sitting in the officer's patrol car during the conversation. *Id.* The encounter between Sergeant Cowans and Defendant was arguably less coercive, as Defendant was voluntarily waiting at the scene when he spoke with Cowans. Cowans did not tell Defendant that he had to stay and talk to him, and

16

Cowans respected Defendant's refusal to be searched. Additionally, Cowans did not draw his weapon or put his hand on his gun, and he did not speak to Defendant in an overbearing or coercive tone. *See* Body Camera Video. The brief conversation concluded when Cowans walked over to Defendant's van to look through its windows. In fact, Defendant followed Cowans to the van, further demonstrating his freedom of movement. Ex. A to Phillips Decl. at 010. Consequently, the Court finds that the totality of the circumstances surrounding Cowans's engagement with Defendant demonstrates that the encounter was consensual.

Even if Sergeant Cowans's conversation with Defendant constituted an unconstitutionally renewed seizure, which it did not, the discovery of the gun was untainted. "The question is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Johns*, 891 F.2d 243, 246 (9th Cir. 1989) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Defendant's condition at the time of the gun's discovery is immaterial, as he could not have removed the gun from the vehicle while it remained detained. Consequently, any renewed seizure of Defendant had no effect on the discovery of the gun.

**CONCLUSION**

For the foregoing reasons, the Court finds that Defendant and his vehicle were constitutionally detained pursuant to the officers' reasonable suspicion that he was engaged in criminal activity. Accordingly, Defendant's motion to suppress evidence is DENIED.

**IT IS SO ORDERED.**

Dated: 06/16/15

_____
THELTON E. HENDERSON
United States District Judge